UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ESTATE OF ANTHONY DASARO, DECEASED by and through Rosetta Dasaro, Administratrix, et al.<br><br>*Plaintiff,*<br>v.<br><br>COUNTY OF MONMOUTH, et al.<br><br>*Defendants.* | Civil Action No.: 14-cv-07773 (PGS)<br><br>**MEMORANDUM AND ORDER** |

SHERIDAN, U.S.D.J.

Presently before the Court are four motions: Defendant Correct Care Solution, LLC's (hereinafter, "CCS") motion for summary judgment (ECF No. 59); Plaintiff Rosetta Dasaro's motion for summary judgment (ECF No. 60); Defendants Monmouth County Correctional Institution's (hereinafter, "MCCI") and County of Monmouth's motion for summary judgment (ECF No. 61); and Defendants MCCI and County of Monmouth's motion to alter judgment, motion to strike, and motion for summary judgment (ECF No. 69). For the reasons discussed herein, Defendants CCS's, and MCCI and County of Monmouth's motions for summary judgment are granted.

### BACKGROUND

This matter arises out of the death of Decedent Anthony Dasaro (hereinafter, "Decedent") on May 3, 2014 at MCCI. His wife, Rosetta Dasaro, on her own behalf and as the administrator of Decedent's estate, is the named plaintiff in this action.

On April 28, 2014, Manalapan Township Police arrested Decedent for simple assault, which stemmed from an altercation with his wife. (MCCI Statement of Material Facts [SOMF] at

1

¶ 6). A New Jersey Superior Court judge set Decedent's bail at $2,500 and ordered he be held in custody at MCCI until his next scheduled court date. (*Id.* at ¶ 7). MCCI contracts with CCS to provide medical and mental health care services for inmates at MCCI. (*Id.* at ¶ 3). Prior to this incident, Decedent had never been held in custody at MCCI. (*Id.* at ¶ 9). As such, upon arriving at MCCI, Decedent was medically screened by a CCS booking nurse, Defendant Ashley LaBarbera. (*Id.* at ¶ 24). During this screening, Decedent conceded that he had taken non-prescribed valium; as such, LaBarbera recommended that Decedent be placed in "detox housing." (Plaintiff's SOMF at ¶ 15). Unlike protective custody, detox housing is an open dormitory setting, where inmates are under twenty-four hour supervision. (*Id.* at ¶ 19). In addition, detox housing does not have individual cells or bunk beds, which Plaintiff contends is significant.

Nevertheless, after LaBarbera's initial screening, Decedent underwent an Initial Mental Health Evaluation by Defendant Dr. Alicia Caputo-Smith, a clinical psychologist and CCS's Director of Mental Health. (MCCI at ¶ 24). According to a Psychiatric Screening form prepared by Caputo-Smith and LaBarbera, Decedent reportedly suffered from acute Post-Traumatic Stress Disorder ("PTSD") and took non-prescribed valium. (ECF No. 59-12, "Exhibit G"). After completing these evaluations, Dr. Caputo-Smith concluded that Decedent did not pose a risk for suicide. (MCCI SOMF at ¶ 25). Over the next five days, Decedent underwent twelve more psychiatric evaluations, where he was evaluated for alcohol or sedative withdrawals and suicidal tendencies. (ECF No. 59-14, "Exhibit I"). In none of these evaluations was it reported that Decedent expressed thoughts of suicide, had a "suicide plan," or "[e]xpresse[d] feelings there is nothing to look forward to in the future." (*Id.*).

At deposition, LaBarbera testified that Decedent initially appeared upset and stressed; but shortly thereafter collected himself and became cooperative. (ECF No. 60-7, "Exhibit A" at 13-

14, 20-21). LaBarbera claimed, "[h]e had a total[ly] different tune to his attitude, and he was able to do the intake. He was actually very talkative with me. . . . at that point he was not crying anymore. He was not upset." (*Id.* at 21). However, because of his claimed use of valium, LaBarbera recommended that Decedent be placed in "detox housing." (*Id.* at 25; Plaintiff's SOMF at ¶ 15). Dr. Caputo-Smith provided essentially the same testimony, explaining that Decedent was initially upset, which is common during intake, and that he regained control of his emotions. (ECF No. 60-10, "Exhibit D" at 27-30). Dr. Caputo-Smith also acknowledged that Decedent exhibited several risk factors for committing suicide, such as his being reincarcerated and estranged from his family, but that he also demonstrated "protective factors," such as his Catholic belief against committing suicide and his desire to re-connect with his family. (*Id.* at 26-27). Although Decedent was going to be placed in detox housing, Dr. Caputo-Smith explained that Decedent signed himself into protective custody, given his background in law enforcement. (*Id.* at 27).

As part of MCCI's booking process, Sergeant Rick Lombardo also conducted a classification interview with Decedent, to identify any special medical needs and to determine Decedent's custody status. (*Id.* at ¶ 26). According to Lombardo, Decedent denied having any mental or medical health needs, drug or alcohol problems, or thoughts of suicide; nor did he show any signs of the same. (*Id.* at ¶¶ 26-32). At Decedent's own request, MCCI placed him in protective custody, since he was a retired police officer and was concerned with his own safety. (*Id.* at ¶¶ 34-35). Although he was placed in protective custody, neither party disputes that Decedent was placed in a cell without a bunkbed.

At 1:02 p.m. on May 3, 2014, Decedent was found unresponsive in his jail cell, with a bed sheet tied around his neck. (*Id.* at ¶ 12). In the hours prior, video surveillance depicts MCCI Corrections Officers making visual observations of Decedent in his cell at least every thirty

minutes. (*Id.* at ¶¶ 10-11). An autopsy report the next day identifies hanging as the cause of Decedents death, which was ruled a suicide. (*Id.* at ¶¶ 14-15).

In her Second Amended Complaint ("SAC"), Plaintiff alleges claims of medical negligence and deliberate indifference pursuant 42 U.S.C. § 1983. Plaintiff names CCS and its employees, Martin Marino, Pauline Tyas, Kabeeruddin Hashini, Ashley LaBarbera, and Alicia Caputo-Smith as Defendants (hereinafter, "CCS Employees"). According to the SAC, CCS Employees:

> Failed to take a proper history from the decedent, Anthony Dasaro; failed to perform a proper evaluation of the decedent, Anthony Dasaro; failed to properly assess the risk of suicide; failed to properly recommend proper housing for preventing suicide; failed to administer the decedent, Anthony Dasaro's, anti-depressant medication, resulting in Mr. Dasaro's death.

(SAC at ¶ 29). Plaintiff makes similar allegations against MCCI and County of Monmouth (hereinafter, "County Defendants"). Specifically, Plaintiff asserts that County Defendants were negligent in their hiring of employees, failed to adequately train and supervise its employees, and were deliberately indifferent to Decedent's medical needs.

### LEGAL STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and

all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; S*iegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor...that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 F. App'x 222, 227 (3d Cir. 2007).

## ANALYSIS

I. Medical Negligence

CCS and County Defendants seek summary judgment dismissal of Counts I and III, wherein the Court understands Plaintiff to assert claims of medical negligence. Specifically, Defendants contend that summary judgment is warranted since Plaintiff failed to serve an Affidavit of Merit, as required under N.J.S.A. § 2A:53A-27, and failed to furnish expert testimony establishing that Defendants deviated from the appropriate standard of care. Finally, County

Defendants seek summary judgment dismissal of Plaintiff's state law claims, since it is entitled to qualified immunity. Because the Court concludes that Plaintiff failed to properly serve AOM on Defendants, and failed to furnish an expert to establish a deviation of the standard of care, the Court need not address County Defendants' qualified immunity argument.

*1. Affidavit of Merit (AOM)*

CCS, on behalf of itself and its employees, contends that since Plaintiff has failed to provide AOMs against either it or its employees, Plaintiff's negligence claims are barred. County Defendants join CCS in support of this argument. Plaintiff does not address this issue.

New Jersey's AOM statute was designed to "'require plaintiffs in malpractice cases to make a threshold showing that their claim is meritorious, in order that meritless lawsuits readily could be identified at an early stage of litigation.'" *Nuveen Mun. Trust v. Withumsmith Brown P.C.*, 752 F.3d 600, 603 (3d Cir. 2014) (quoting *Couri v. Gardner*, 801 A.2d 1134, 1137 (N.J. Sup. Ct. 2002)). The statute requires plaintiffs in medical malpractice and negligence lawsuits to "provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices." N.J.S.A. § 2A:53A-27. "Failure to submit an appropriate affidavit ordinarily requires dismissal of the complaint with prejudice." *Meehan v. Antonellis*, 141 A.3d 1162, 1169 (N.J. Sup. Ct. 2016). In determining whether the statute applies, the court considers three elements:

> (1) whether the action is for "damages for personal injuries, wrongful death or property damage" (nature of injury); (2) whether the action is for "malpractice or negligence" (cause of action); and (3) whether the "care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint [] fell outside acceptable professional or occupational standards or treatment practices" (standard of care).

6

*Couri*, 801 A.2d at 1137 (quoting N.J.S.A. § 2A:53A-27)). Here, neither party disputes that all three elements are present; instead, the Court focuses on whether CCS, CCS Employees, and County Defendants constitute "licensed persons" protected under the statute.

In its answer to Plaintiff's SAC, CCS and CCS Employees each identified their area of expertise and asserted protection under the statute. (ECF No. 59-7, "Exhibit B"). Specifically, LaBarbera declared that she is a Licensed Practical Nurse (*Id.* at 3); Dr. Caupto-Smith declared that she is a licensed clinical psychologist (*Id.* at 5); Dr. Kabeeruddin Hashmi declared that he is a Board Certified Internal and Emergency Medicine Doctor (*Id.* at 7); Martin Marino declared that he is a Registered Nurse (*Id.* at 9); and Paula Tyas declared that she is a Nurse Practitioner (*Id.* at 11). Similarly, County Defendants asserted protection under the AOM statute as governmental entities. (ECF No. 48 at 29).

Taking each profession in turn, the Court has little difficulty concluding that Dr. Hashmi constitutes a "licensed person" under the statute. *See* N.J.S.A. § 2A:53A-26(f) (listing as a "licensed person" "a physician in the practice of medicine or surgery"). Similarly, the Court is satisfied that Nurses LaBarbera, Marino, and Tyas all meet the "registered professional nurse" description identified under N.J.S.A. § 2A:53A-26(i). As such, because Dr. Hashmi and Nurses LaBarbera, Marino, and Tyas all fall within "licensed persons" under the AOM, summary judgment will be granted, since no AOMs were ever served.

However, because "[p]sychologists are not included in the list of 'licensed person' as to whom an Affidavit of Merit is required," Dr. Caputo-Smith is not entitled to summary judgment based on the absence of an AOM. *See Endl v. New Jersey*, No. 12-3564, 2016 U.S. Dist. LEXIS 41713 at *49 (D.N.J. Mar. 29, 2016) (citing N.J.S.A. § 2A:53A-26); *see also Troy D. v. Mickens*, No. 10-2902, 2013 U.S. Dist. LEXIS 86736, at *10 (D.N.J. June 20, 2013) ("Psychologists are not

included in the list of licensed persons under N.J.S.A. § 2A:53A-26. Therefore, ... no affidavits of merit are required."). Similarly, CCS does not dispute the fact that it is not a "health care facility" as defined under the AOM statute. N.J.S.A. § 2A:53A-26(j); *Albrecht v. Corr. Med. Servs.*, 27 A.3d 1260, 1264-65 (N.J. Super. Ct. App. Div. 2011) (holding that Correction Medical Services was not entitled to the protections of the AOM statute since it failed to demonstrate that it was a licensed health care facility). Instead, CCS argues that the Court should read the AOM statute broadly, since it nevertheless remains vicariously liable for the actions of its employees. However, *Albrecht* explicitly explained, "when a firm's shareholders are licensed persons under the statute, a plaintiff is required to provide an AOM in order to pursue litigation against the firm alone under respondeat-superior principles." 27 A.3d at 1265. Here, CCS does not assert that its licensed professionals are also shareholders of the company; as such, the Court sees no reason to extend AOM protection to an otherwise unprotected entity.

Finally, the Court is guided by Judge Sabatino's recent decision in *McCormick v. State*, 144 A.3d 1260 (N.J. Super. Ct. App. Div. 2016) in finding that Plaintiff was required to serve AOMs against County Defendants. In *McCormick*, a State prisoner brought a medical malpractice lawsuit solely against the State for injuries he sustained due to the alleged negligence of licensed doctors, who were under contract with the State. *Id.* at 1262-64. Although the State does not fall within any of the "licensed persons" identified under statute, the court nevertheless concluded that the plaintiff was required serve it with an AOM. *Id.* at 1266. The court explained, "[i]f such professionals while serving the State, or for that matter any other public entity, engage in harmful conduct that deviates from the standards of care of their respective fields of licensure, and a plaintiff claims that the defendant public entity is liable for that harm under agency principles, then an AOM from an appropriate qualified person is necessary to support the lawsuit." *Id.* Here, it

8

cannot be disputed that County Defendants constitute "public entities" and the basis of Plaintiff's negligence claim arises from actions taken by its custodial employees. As such, consistent with *McCormick*, the Court finds that Plaintiff's failure to serve County Defendants with AOMs warrants dismissal of her claims against them.

In sum, since CCS employees (with the exception of Dr. Caputo-Smith) and County Defendants are protected parties under the AOM statute, Plaintiff's failure to serve them with AOM warrants dismissal of her negligence claims. However, with regards to CCS and Dr. Caputo-Smith, because neither falls within the AOM's protection, summary judgment will not be granted on this basis. Therefore, the Court next considers whether Plaintiff was required to furnish expert opinion to establish her negligence claim.

2.   *Failure to Furnish Expert Opinion*

CCS next moves for summary judgment dismissal of Plaintiff's medical negligence claims since Plaintiff has failed to furnish expert testimony establishing a deviation from a standard of care. Plaintiff responds, contending that expert testimony is not required since the subject matter is within the understanding of the average jury. The Court disagrees.

"To establish a prima facie case of negligence in a medical malpractice action, a plaintiff must present expert testimony establishing: (1) an applicable standard of care, (2) a deviation from this standard of care, (3) injury, and (4) proximate causation between the breach and the injury." *Jackson v. Fauver*, 334 F. Supp. 2d 697, 740 (D.N.J. 2004). "In the typical case, the plaintiff must establish that standard through expert testimony because 'a jury generally lacks the requisite special knowledge, technical training and background to be able to determine the applicable standard of care without the assistance of an expert.'" *Borenstein v. Monmouth Cnty. Sheriff's Office*, 658 F. App'x 663, 669 (3d Cir. 2016). However, under the "doctrine of common

knowledge," a plaintiff is not required to establish the applicable standard of care through expert testimony, when "the defendant's negligence is obvious 'to anyone of average intelligence and ordinary experience.'" *Id.* (quoting *Estate of Chin v. St. Barnabas Med. Ctr.*, 734 A.2d 778, 785-86 (N.J. Sup. Ct. 1999)).

Here, Plaintiff contends the present matter is no different than other common knowledge doctrine cases. *See Tierney v. St. Michael's Med. Ctr.*, 518 A.2d 242 (N.J. Super. Ct. App. Div. 1986) (where the hospital failed to place an infant in a safety crib and the infant sustained a fractured skull from falling); *Winters v. Jersey City*, 293 A.2d 431 (N.J. Super. Ct. App. Div. 1972) (where the hospital failed to elevate the guard rails on the side of an elderly patient's bed, thereby causing the plaintiff to fall out of bed); *Martin v. Perth Amboy Gen. Hosp.*, 250 A.2d 40 (N.J. Super. Ct. App. Div. 1969) (where a doctor left a surgical sponge in the plaintiff's stomach, causing severe abdominal pain). In *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 580 (3d Cir. 2003), the Third Circuit found applicable the common knowledge doctrine, where the defendant health services and prison failed to administer insulin to a diabetic inmate. Notably, the prison never asked the inmate or his treating physician how often he needed insulin. *Id.* As such, the court concluded, "[w]hile laypersons are unlikely to know how often insulin-dependent diabetics need insulin, common sense -- the judgment imparted by human experience -- would tell a layperson that medical personnel charged with caring for an insulin-dependent diabetic should determine how often the diabetic needs insulin." *Id.*

Here, the Court finds persuasive Judge Simandle's recent decision in *Estate of Allen v. Cumberland County*, No. 15-6273, 2017 U.S. Dist. LEXIS 99715, at *10-11 (D.N.J. June 29, 2017). In *Allen*, the estate filed a professional negligence claim against a nurse for conducting a deficient psychological examination of the decedent, who committed suicide two days later. *Id.* at

*1-2. Tasked with determining whether the common knowledge doctrine should apply, the court explained that allegations that a nurse failed to "evaluate *properly*" the decedent fell beyond the scope of the doctrine. *Id.* at *10-12 (emphasis in original). The court noted that, unlike typical common knowledge claims, the plaintiff did not allege that the nurse failed to evaluate the decedent at all or that she ignored any mention of the decedent's suicidal thoughts. *Id.* at *11-12. As such, the court concluded, "[a]n expert . . . is precisely what lay finders of fact would need: to describe the standard of nursing care applicable to the evaluation of [the decedent] under these circumstances, and that there is a reasonable probability that [the nurse] breached that standard." *Id.* at *12.

Here, the Court arrives at the same conclusion. The thrust of Plaintiff's negligence claim is that Defendants should have identified that Decedent posed a risk of suicide and should have been placed in detox housing. However, like in *Allen*, this is not a case where Defendants failed to evaluate Decedent altogether, or that he was in any other way neglected, such that this Court reasonably infer negligence. In short, contrary to Plaintiff's contention, it is not "readily apparent to anyone of average intelligence and ordinary experience" would find any Defendant negligent. *Chin*, 734 A.2d at 785-86. As such, the Court is satisfied that the common knowledge doctrine is inapplicable to the present matter. Therefore, since Plaintiff has failed to establish an applicable standard of care and that Defendants breached that care, summary judgment is granted in its entirety, as it pertains to Plaintiff's negligence claims.

In short, even if the AOM statute were inapplicable, Plaintiff still had the burden of furnishing an expert to demonstrate the standard of care and how all named Defendants deviated from that care. Her failure to provide such testimony is fatal to her negligence claims. Therefore, summary judgment is granted in its entirety.

II. Federal Civil Rights Claims Under 42 U.S.C. § 1983

*1.    Deliberate Indifference*

CCS and CCS employees next seek summary judgment dismissal of Counts II and XII of Plaintiff's Complaint, wherein she generally alleges that CCS and CCS Employees were deliberately indifferent towards Decedent's suicidal tendencies.

Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

*Id.* To sustain a claim under Section 1983, a plaintiff must demonstrate: (1) "that they have been deprived of a right 'secured by the Constitution and the laws' of the United States"; and (2) that the defendant "deprived them of this right acting 'under color of any statute'" or state law. *Flagg Bros, Inc. v. Brooks*, 436 U.S. 149, 155 (1978). Because Decedent was not a convicted prisoner, Eighth Amendment protections do not directly apply. *See Natale*, 318 F.3d at 581 (noting that the Eighth Amendment only applies "after the State has secured a formal adjudication of guilt in accordance with due process of law." (internal quotation marks and citations omitted)). Instead, pre-trial detainees, such as Decedent, are afforded similar protections pursuant the Due Process Clause of the Fourteenth Amendment. *Id.* However, when evaluating deliberate indifference claims under the Fourteenth Amendment, courts still apply the same standard "used to evaluate similar claims brought under the Eight Amendment." *Id.* at 582; *see also Woloszyn v. Cnty of Lawrence*, 396 F.3d 314, 319 n.5 (3d Cir. 2005). As such, "[a] detainee is entitled under the Due Process Clause of the Fourteenth Amendment to, at a minimum, no less protection for personal security than that afforded convicted prisoners under the Fourteenth Amendment and no less a

level of medical care than that required for convicted prisoners by the Eighth Amendment." *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 668 (3d Cir. 1988) (*Colburn I*). Here, CCS and CCS employees do not dispute that they were acting under the color of state law, when it provided Decedent medical treatment and care; however, they do contend that the record fails to demonstrate any purported violation of Plaintiff's Fourteenth Amendment rights.

It is well-established that "the suicide of a pretrial detainee can support a recovery in a 42 U.S.C. § 1983 action." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) (*Colburn II*). In the context of detainee prison suicide, "if [custodial] officials know or should know of the particular vulnerability to suicide of an inmate, then the Fourteenth Amendment imposes on them an obligation not to act with reckless indifference to that vulnerability." *Colburn I*, 838 F.2d at 669. As such, in order to set forth a cognizable prison suicide claim, the plaintiff must demonstrate: "(1) the detainee had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers 'acted with reckless indifference' to the detainee's particular vulnerability." *Colburn II*, 946 F.2d at 1023. "[T]he requirement of 'reckless or deliberate indifference' implies that there must be 'a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur.'" *Id.* In addition, the plaintiff must also show "that the custodian officials 'knew or should have known' of that strong likelihood." *Id.*

Here, the record plainly fails to demonstrate the existence of deliberate indifference. Upon being taken into MCCI custody, Decedent went through routine psychiatric and drug-related intake assessments, to determine if there were any concerns that needed to be addressed upon his admission; which there were none. Over the course of Decedent's incarceration, additional psychiatric evaluations were conducted more than twice a day. At no point during any of these

13

assessments did Decedent show any signs of suicidal tendencies, nor did he complain of as much to any officer. As such, even when viewing the record in Plaintiff's favor, it nevertheless fails to demonstrate that, during his detention, Decedent had a "strong likelihood" of committing suicide. As best this Court can tell, Plaintiff takes issue with the fact that Defendants failed to place him in "detox housing." However, this, in and of itself, fails to demonstrate deliberate indifference. *See Thomas v. Dragovich*, 142 F. App'x 33, 36 (3d Cir. 2005) ("a deliberate indifference claim requires that a prisoner demonstrate 'more than negligence'" (citation omitted)); *see also Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) ("mere disagreement as to the proper medical treatment" does not "support a claim of an Eighth Amendment violation). As such, CCS's and CCS Employees' motion for summary judgment dismissal of Plaintiff's Section 1983 medical indifference claims are granted.

*2. Monell Liability*

County Defendants next seek dismissal of Counts IV through XI,[1] wherein Plaintiff generally alleges that County Defendants are liable under *Monell v. New York City Department. of Social Services*, 436 U.S. 658 (1978). The Court understands Plaintiff to present three separate theories that purportedly establish *Monell* liability: (1) the existence of an unconstitutional policy or custom; (2) deliberate indifference; and (3) failure to adequately supervise and train the corrections officers. However, because MCCI is a corrections facility, it is not a "person" subject to suit under Section 1983. *See Crawford v. McMillan*, 660 F. App'x 113, 116 (3d Cir. 2016) ("the prison is not an entity subject to suit under 42 U.S.C. § 1983"); *Slagle v. Cty of Clarion*, 435 F.3d 262, 264 n.3 (3d Cir. 2006) ("it is well established in the Third Circuit that a prison is not a 'person'

---

[1] At oral argument, Plaintiff withdrew Counts IV, VII and VIII.

subject to suit under federal civil rights laws." (internal quotation marks and citation omitted)). As such, the Court addresses these issues as they pertain to County of Monmouth.

First, Plaintiff contends that County of Monmouth is liable under *Monell*, for maintaining a "systematic deficiency, policy, custom, and pattern." As a general rule, a municipality cannot be held liable under Section 1983 based on a respondeat superior theory. *Monell*, 436 U.S. at 691. It is hornbook law that "a municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* A government entity may be held liable for a constitutional violation if the plaintiff can "identify a policy or custom of the entity that caused the constitutional violation." *A.M. ex rel. J.M.K v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 580 (3d Cir. 2004). A custom can be demonstrated through "a given course of conduct, although not specifically endorsed or authorized by law . . . [that] is so well-settled and permanent as virtually to constitute law." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). However, a single isolated incident will not suffice, unless the custom can be demonstrated by other means like "proof of knowledge and acquiescence." *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989). "Proof only of the existence of an unlawful policy or custom is not sufficient, however, to impose municipal liability under section 1983. A plaintiff must also establish that the government policy or custom was the proximate cause of the injuries sustained." *See Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996) (citation omitted); *see also Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004). Here, Plaintiff fails to identify any custom or policy that caused a constitutional violation, nor has she alleged any conduct by the County, or County official, that would otherwise support her claim. *See McTernan v. City of New York*, 564 F.3d 636, 658 (3d Cir. 2009) (requiring the plaintiff to "identify a custom or policy, and specify what exactly that custom or policy was").

15

Next, Plaintiff generally claims that County of Monmouth was deliberately indifferent towards the needs of Decedent. Again, however, Plaintiff fails to specifically identify any action or inaction taken by the County of Monmouth that would support this assertion. Nevertheless, the record supports a finding that the County of Monmouth and MCCI were diligent in their care and treatment of Decedent. Besides CCS's individual psychiatric assessments of Decedent, Sergeant Lombardo conducted an independent interview with him, to identify any potential risks he may have posed. And, when Decedent expressed a desire to be placed in protective custody, given his law enforcement background, Defendants complied. Finally, video surveillance depicts corrections officers routinely checking Decedent's cell in thirty minute intervals. Simply put, even when viewing the record in the light most favorable to Plaintiff, there is nothing to suggest that County of Monmouth was deliberately indifferent to Decedent's needs.

Finally, Plaintiff asserts that County of Monmouth failed to adequately train the corrections officers. In order to show the same, plaintiff must demonstrate that "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton v. Harris*, 489 U.S. 378, 388 (1989). As noted above, "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "[A] plaintiff must show specific training deficiencies and either (1) a pattern of constitutional violations of which policy-making officials can be charged with knowledge, or (2) that training is obviously necessary to avoid

constitutional violations." *Gaymon v. Esposito*, No. 11-4170, 2012 U.S. Dist. LEXIS 44310, at *23 (D.N.J. Mar. 29, 2012) (citing *Canton*, 489 U.S. at 390).

Plaintiff plainly fails to meet this stringent standard of fault. First, Plaintiff offers no competent evidence to support her conclusory allegations that County of Monmouth's training was inadequate. Instead, the record reflects that MCCI was in compliance with all New Jersey Department of Correction's laws, regulations, and standards governing Adult County Correctional Facilities. (ECF No. 61-4 at 5). Even assuming these standards were not up to par, Plaintiff nevertheless fails to demonstrate that County of Monmouth was aware of these deficiencies or intentionally disregarded them. Finally, Plaintiff fails to identify a pattern of constitutional violations that would otherwise place the County of Monmouth of notice. *Connick*, 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train").

In short, Plaintiff has failed to meet her burden of demonstrating that County of Monmouth maintained a policy that violated constitutional rights, was "deliberately indifferent" towards Decedent's needs, or was "deliberately indifferent" to a purported training deficiency. Therefore, the Court will grant County Defendants' summary judgment motion on Counts V through XI of the Complaint.

### ORDER

Having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented, and for good cause shown, and for all of the foregoing reasons,

IT IS on this ___ day of _____, 2018;

**ORDERED** that Defendant Correct Care Solution, LLC's motion for summary judgment (ECF No. 59) is **GRANTED** in its entirety; and it is further

17

**ORDERED** that Defendants MCCI and County of Monmouth's motion for summary judgment (ECF No. 61) is **GRANTED** in its entirety; and it is further

**ORDERED** that Defendants, County of Monmouth and Monmouth County Correctional Institution's motion to alter judgment, motion to strike, and motion for summary judgment (ECF No. 69) is **DENIED** as moot; and it is further

**ORDERED** that Plaintiff Rosetta Dasaro's motion for summary judgment (ECF No. 60) is **DENIED**; and it is further

**ORDERED** that the clerk is directed to close the case.

_____
PETER G. SHERIDAN, U.S.D.J.